Having reviewed the record, the Full Commission affirms with modifications the decision of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times herein.
3. At all relevant times herein, Liberty Mutual Fire Insurance Company was the carrier on the risk for IBM, Zurich-American Insurance Group was the carrier on the risk for Interim Personnel, Villanova Insurance Company was the carrier on the risk for National Transportation Services, and Hecht's Department Store was a duly qualified self-insured employer.
4. The parties stipulated that plaintiff's alleged injury by accident or occupational disease arose on October 17, 1996.
5. The parties stipulated that plaintiff was employed by defendant IBM from December 12, 1994 through February 22, 1995 and August 19, 1996 through November 21, 1996.
6. The parties stipulated that plaintiff was employed by defendant Interim Personnel Services from September 4, 1997 through September 22, 1997.
7. The parties stipulated that plaintiff was employed by defendant National Transportation Services from February 1999 through March 1999.
8. The parties stipulated that plaintiff was employed by defendant Hecht's Department Store for approximately three to four weeks beginning July 10, 1998.
9. The parties stipulated that plaintiff's average weekly wage at IBM was $260.80, yielding a compensation rate of $173.92.
10. The parties stipulated that plaintiff's average weekly wage at Interim Personnel Services was $211.47, yielding a compensation rate of $140.99.
11. The parties stipulated to plaintiff's November 22, 1999 recorded Statement.
12. The parties stipulated to plaintiff's IBM personnel file.
13. The parties stipulated to plaintiff's Interim Personnel Services personnel file.
14. The parties stipulated to plaintiff's medical records from IBM medical department and Duke University.
15. The issues presented were:
 a) Whether plaintiff sustained an injury by accident arising out of the course of her employment with defendant-IBM, defendant-Interim Personnel Services, defendant-Hecht's Department Store or defendant-National Transportation Services?
 b) Whether plaintiff contracted an occupational disease arising out of her employment with defendant-IBM, defendant-Interim Personnel Services, defendant-Hecht's Department Store or defendant-National Transportation Services?
 c) Whether plaintiff refused suitable employment from defendant-IBM?
 d) If plaintiff contracted an occupational disease arising out of her employment with defendant-IBM, defendant-Interim Personnel Services, defendant-Hecht's Department Store or defendant-National Transportation Services, under whose employment was plaintiff last injuriously exposed?
 e) Whether plaintiff is entitled to any benefits under the North Carolina Workers' Compensation Act?
 ***********
Based upon all the evidence adduced from the record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. At the time of the evidentiary hearing, plaintiff was a 34-year-old high school graduate with one year of college credit. Plaintiff stayed at home to raise her five children from the 1980s until the mid 1990s. Plaintiff is right hand dominant.
2. Defendant-employer IBM hired plaintiff as an assembler on August 19, 1996. Plaintiff's job duties included lifting the base of a computer, which weighed 10 to 15 pounds. Plaintiff worked as an assembler for approximately two weeks when she began to experience pain in her right shoulder. Plaintiff continued to work for defendant-employer IBM. In September 1996 plaintiff began the job of final inspector. Plaintiff's job duties included performing a visual inspection of the central processing unit and scanning a bar code. During this inspection, plaintiff had to pick up the corner of a 15-pound central processing unit to make sure that the feet were on all four corners of the bottom of the unit. The inspection process began when the central processing unit came toward plaintiff on an assembly line. Plaintiff operated a foot pedal that pushed rollers up in front of her. Plaintiff would then pull the unit across the rollers toward her. The rollers allowed the unit to roll freely. After her visual inspection of the unit, plaintiff would scan the bar code, which required plaintiff to reach above and to the right of eye level for a scanner. Once plaintiff scanned the bar code, plaintiff would put the scanner back in its place. Plaintiff would then push the unit back over the rollers on to the assembly line and begin inspection of a new unit.
3. After plaintiff worked the final inspection job, she worked on two other jobs at IBM, one of which was building Aptiva computers.
4. At the evidentiary hearing, plaintiff testified that her right shoulder pain worsened throughout September and October 1996 and that she reported her pain to her supervisor, William Flaggerty. Plaintiff stopped working for defendant-employer IBM on October 17, 1996, due to her right shoulder pain.
5. On October 21, 1996, plaintiff presented to Dr. David Tsai complaining of right shoulder soreness and pulling. Plaintiff reported to Dr. Tsai that her job involved frequent lifting of computers onto the assembly line, which caused her discomfort. Dr. Tsai diagnosed plaintiff with a biceps head rupture and referred her to an orthopaedist, Dr. Speer.
6. On November 5, 1996, plaintiff presented to Dr. Douglas Campbell, a physician in defendant-employer IBM's medical department. Plaintiff reported pain in her right upper extremity during her first week at work. Dr. Campbell released plaintiff to return to work on November 5, 1996, with a left-handed work only restriction.
7. On November 7, 1996, plaintiff returned to work and defendant-employer IBM provided plaintiff with left handed work while seated, which required plaintiff to guide a component over rollers and down a conveyor belt with her left hand and arm. However, after only two hours on this job, plaintiff left work complaining of right shoulder pain.
8. Plaintiff never called back and never returned to work for defendant-employer IBM.
9. Plaintiff presented to Dr. Kevin P. Speer, an orthopaedic surgeon, on October 21, 1996, and complained of right shoulder soreness and pulling which plaintiff attributed to her job on the assembly line with defendant-employer IBM. Dr. Speer diagnosed plaintiff with bursitis, biceps tendonitis, and right shoulder impingement syndrome. On March 4, 1997, Dr. Speer performed a right shoulder arthroscopy, biceps tendonotomy and subacromial decompression.
10. Plaintiff continued to complain of pain, however, and in September 1997, Dr. Speer recommended plaintiff consult with a neurosurgeon, which examination was negative. Dr. Speer then determined that plaintiff had reached maximum medical improvement and rated her with a 20% permanent partial disability to her right upper extremity.
11. On September 4, 1997, plaintiff secured employment on her own and started to work with defendant-employer Interim Personnel Services. From September 4, 1997, until on or about September 22, 1997, plaintiff worked for various employers. Plaintiff worked full-time with these employers and earned a minimum of $6.00 per hour. Plaintiff's job activities included clerical work. Plaintiff resigned on or about September 22, 1997, due to childcare issues.
12. Plaintiff returned to work for defendant-employer Hecht's Department Store as a Sales Associate on July 10, 1998. Plaintiff's job duties required some walking and scanning. Plaintiff worked four hours per day. Plaintiff resigned on or about July 31, 1998, due to childcare issues.
13. Plaintiff returned to work for defendant-employer National Transportation Services as a receptionist in February 1999. Plaintiff testified that she alternated hands to answer the telephones. Plaintiff resigned in March 1999.
14. At the hearing, defendant-employer IBM's Program Manager, Percy Caldwell, testified that he supervised Mr. Flaggerty and plaintiff. Mr. Caldwell also testified that there was no overhead lifting with the assembly job except to reach for a trash bin.
15. Medical evidence was presented to the Commission in the form of deposition testimony from Kevin P. Speer, M.D., and medical records. Plaintiff saw Dr. Tsai who suspected a biceps head rupture and referred plaintiff to Dr. Speer, an orthopaedist. A MRI was performed on October 28, 1996 at Duke University Medical Center which the radiologist reported failed to show any right shoulder abnormality. An MRI was performed on plaintiff's right arm and shoulder on November 13, 1996, for the purpose of determining whether she had a rotator cuff tear. This MRI failed to reveal a rotator cuff tear, but did reveal degenerative changes in the supraspinatus tendon (tendiopathy) and a small amount of subacrominal bursal fluid (bursitis). On March 4, 1997, plaintiff had surgery at Duke University Medical Center which consisted of right shoulder diagnostic and operative arthroscopy, arthroscopic biceps tenotomy, and arthroscopy subacromial decompression. On June 5, 1997, a MRI was performed of plaintiff's cervical spine which was essentially normal, with the report of a small disk protrusion at T1-2 without effect on the thecal sac and hemangioma at the C7 cervical body. Also on June 5, 1997, a MRI of the right brachial plexus was performed which was reported as normal. On June 9, 1997, Dave Gehrman, a physicians assistant with Dr. Speer's office, noted that plaintiff's symptoms continued unchanged despite the surgery. Plaintiff was referred for a neurological consult to evaluate potential neurologic etiology for her symptoms. The neurological consult note dated August 29, 1997, indicates that the doctors suspected possible brachial neuritis and referred plaintiff for an EMG to confirm this potential diagnosis. On October 24, 1997, nerve conduction studies and EMG was performed which failed to establish any neurological damage. On January 30, 1998, Drs. Mazeika and Scott, neurologists, reported that plaintiff's shoulder pain was of unclear etiology.
16. Dr. Speer's deposition testimony essentially tracked the information contained in plaintiff's medical records. Dr. Speer testified that plaintiff consistently complained of right shoulder pain which plaintiff related to her work activity at IBM. Dr. Speer was concerned that plaintiff's shoulder pain may have been a rotator cuff tear rather than simply tendonitis. A MRI was requested and it failed to report a tear or other structural injury. The MRI did reveal tendonitis and bursitis. When plaintiff's condition had not improved with conservative care by January 1997, Dr. Speer recommended an arthroscopic subacromial decompression to address plaintiff's bursitis and tendonitis in her right shoulder. A spur was found in the front of plaintiff's shoulder and the biceps tendon was released. Plaintiff did not improve post surgery and Dr. Speer suspected a potential cervical problem and requested a cervical MRI and brachial plexus MRI which were unremarkable. These studies did not reveal any significant abnormality that could be associated with plaintiff's shoulder and arm pain. Dr. Speer referred plaintiff for neurological referral, however, the EMG was normal and they could not find a neurological cause for plaintiff's condition. Dr. Speer testified that plaintiff did not have a ruptured biceps muscle or tendon as suspected by Dr. Tsai.
17. Dr. Speer explained that he initially believed that plaintiff had a biceps injury. Plaintiff's symptoms, however, did not change after the surgery, and thus that pathology was not the cause of plaintiff's symptoms. The bursitis and the bursal scarring were removed in the surgery and were no longer present to explain plaintiff's continuing symptoms after the surgery. Further, the spur found in plaintiff's shoulder was of little prominence and is a normal finding in many people's shoulders, although it could have been a degenerative condition. The spur was also removed in the surgery and therefore was not the basis of plaintiff's continued symptoms. The shoulder and biceps abnormalities found by Dr. Speer were not the cause of plaintiff's symptoms because her condition did not improve after surgery. Essentially, Dr. Speer testified that despite numerous diagnostic tests and the diagnostic arthroscopy, the doctors were not able to establish an anatomic or structural cause for plaintiff's continued right shoulder pain and shoulder dysfunction.
18. Dr. Speer testified that he believed that plaintiff's undiagnosed problem was caused by her employment at IBM because plaintiff attributed her work to be the cause of her condition and because of the temporal relationship of plaintiff's work to her report of symptoms. Dr. Speer did admit that lifting children and other activities that plaintiff may have been engaged in could also cause these symptoms.
19. Dr. Speer testified that the problems noted in the biceps tendon could not be associated with plaintiff's employment.
20. Medical records and questioning of plaintiff revealed that plaintiff has reported various dates for the onset of her symptoms from as soon as one week following her employment with IBM in August 1996, to dates in October 1996. Dr. Speer was also asked about plaintiff's varying reports concerning the onset of her symptoms and indicated his belief that the inconsistency could indicate confusion on the part of plaintiff or could question the reliability of plaintiff's assertion that employment was the cause of her condition.
21. Dr. Speer gave the opinion that plaintiff's undiagnosed right shoulder problems were caused by and are related to plaintiff's employment with IBM. This testimony was based on the assumption that plaintiff repetitively pushed, pulled and lifted computer components. Dr. Speer, however, explained that his opinion in this case was not based on the ergonomics of plaintiff's job, but on the fact that plaintiff told him that the condition was work related. Dr. Speer testified that he was not an expert on ergonomics and that he cannot state with any degree of medical certainty that plaintiff's condition was caused by work absent the fact that she said it was work related.
22. The greater weight of the competent evidence fails to reveal that plaintiff sustained an injury by accident or occupational disease in the course of her employment with IBM. Although plaintiff's physicians were able to diagnose and treat plaintiff for bursitis and tendonitis (perhaps tenosynovitis), Dr. Speer testified that the exploratory arthroscopy removed this pathology and did not relieve plaintiff's symptoms. Dr. Speer further testified that he could not associate these problems with plaintiff's employment. Second, Dr. Speer and plaintiff's other physicians could not identify any disease, injury, or other anatomical condition or abnormality to plaintiff's body that could explain or support her symptoms. Third, Dr. Speer did not find with any medical certainty that plaintiff's symptoms were caused by work; his opinion was based solely on the subjective report of plaintiff that her condition was caused by work. Finally, Dr. Speer's opinion was based on a description of plaintiff's employment as related by plaintiff, whereas the greater weight of the evidence, particularly considering plaintiff's difficulty in relating a consistent medical history, is that plaintiff's activities were not as heavy and as repetitive as plaintiff described. The greater weight of the evidence is that plaintiff's actual employment was less likely to cause shoulder discomfort and symptoms than the position described by plaintiff.
23. In response to questions concerning injury or change in plaintiff's condition subsequent to her employment with IBM, Dr. Speer was not able to testify about any aggravation or change in plaintiff's condition as a result of her subsequent employment. The competent medical evidence in the record fails to support an injury or occupational disease during plaintiff's employment with Interim Personnel Services, National Transportation Services, and/or Hecht's Department Stores.
24. Despite the unknown etiology of plaintiff's symptoms, Dr. Speer opined that plaintiff at all times should have been able to return to work in a left arm only capacity.
25. The competent evidence in the record establishes that the defendant-employer IBM offered plaintiff a suitable job, consisting of left arm only work, which she unjustifiably refused on November 7, 1996.
26. The competent evidence in the record fails to establish that plaintiff was disabled and unable to earn her alleged pre-injury wage because of her alleged right extremity symptoms. Plaintiff was offered and unjustifiably refused suitable left arm only work at IBM and left subsequent employment because of child care needs rather than at the direction of her doctor.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. The Industrial Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. N.C. Gen. Stat. § 97-86; see Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000); Adams v. AVX Corp., 349 N.C. 676, 680,509 S.E.2d 411, 413 (1998). Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions removed from the ordinary experience of laymen, only an expert witness can give a competent opinion as to the nature of and the cause of the injury. Young v. Hickory Business Furniture, supra; Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). Expert opinion that rests on speculation and conjecture is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of an injury or disease. Young v. Hickory BusinessFurniture, supra; Dean v. Carolina Coach Co., 287 N.C. 515, 522.215 S.E.2d 89, 94 (1975).
2. Plaintiff must prove three elements to establish existence of an occupational disease: (1) there must be proof of a causal connection between the disease and the employment, (2) the disease must be characteristic of a trade or occupation, and (3) the disease must not be an ordinary disease of life to which the public is equally exposed outside of employment. N.C. GEN. STAT. § 97-53 (13); Perry v.Burlington Indus., Inc. 80 N.C. App. 650, 343 S.E.2d 215 (1986), citingHansel v. Sherman Textiles, 304 N.C. App. 44, 283 S.E.2d 101 (1981). To be "characteristic of" and "peculiar to" an occupation, there must be an increased risk of contracting the disease in the employment in question as compared to the general run of occupations. Booker v. Duke MedicalCenter, 297 N.C. App. at 458, 256 S.E.2d at 189 (1979). The burden of proving each and every element of compensability falls squarely on plaintiff. Hansel v. Sherman Textiles, 304 N.C. App. 44, 54,283 S.E.2d 101, 106 (1981).
3. In the instant case, the medical evidence is insufficient to establish that plaintiff's shoulder condition was due to causes and conditions that were characteristic of or peculiar to her employment with the defendant-employer IBM, defendant-employer Interim Personnel Services, defendant-employer Hecht's Department Store, and/or defendant-employer National Transportation Services. The medical evidence in the instant case also fails to establish that plaintiff was at an increased risk of contracting the shoulder condition while performing her job with the defendant-employer IBM, defendant-employer Interim Personnel Services, defendant-employer Hecht's Department Store, and/or defendant-employer National Transportation Services as compared to the general public. N.C. Gen. Stat. § 97-53(13).
4. In the instant case, there is insufficient competent evidence in the record to establish that plaintiff sustained an injury by accident to her right shoulder arising out of the course of her employment with defendant-employer IBM, defendant-employer Interim Personnel Services, defendant-employer Hecht's Department Store or defendant-employer National Transportation Services. N.C. Gen. Stat. § 97-2(6).
5. In the instant case, there is insufficient competent evidence in the record to establish that plaintiff sustained bursitis and/or tenosynovitis as a result of her employment. N.C. Gen. Stat. § 97-53
(17), (21).
6. As plaintiff failed to carry her burden of proof in this case, she is not entitled to benefits under the North Carolina Workers' Compensation Act.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim is DENIED.
2. Each side shall pay its own costs, except that the defendant IBM shall pay the witness fee previously ordered by the deputy commissioner.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER